## JONES et al. v. TEXAS EMPLOYERS' INS. ASS'N. (No. 10771.)

(Court of Civil Appeals of Texas. Fort Worth. Oct. 18, 1924. Rehearing Denied Nov. 29, 1924. Writ of Error Dismissed for Want of Jurisdiction Jan. 28, 1925.)

1. Master and servant ⬥409½, New, vol. 7A Key-No. Series—Question of partial dependency held for jury.

Evidence, that parents were partially dependent on deceased minor employé within Workmen's Compensation Act, pt. 1, § 8a (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—15), held sufficient to take case to jury.

2. Master and servant ⬥388—One may be dependent though able to maintain self without aid.

One is not rendered less dependent within Workmen's Compensation Act, pt. 1, § 8a (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—15), because he is able to maintain himself without assistance of deceased employé.

3. Master and servant ⬥388 — Deceased son's contribution to purchase of home held not to show parents were not dependent.

Deceased employé's contribution toward purchase of home for parents held reasonably necessary for their support, and did not show that parents were not dependent.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Suit by F. M. Jones and another against the Texas Employers' Insurance Association. Judgment for defendant, and plaintiffs appeal. Reversed and remanded.

E. E. Clack and M. M. Parks, both of Dallas, for appellants.
Harry P. Lawther, of Dallas, for appellee.

BUCK, J. On October 12, 1923, and prior thereto, while L. V. Jones, a minor 19 years of age, the son of Mr. and Mrs. F. M. Jones, was in the employment of the Humble Oil & Refining Company, in Stephens county, he received fatal accidental injuries. At the time of said L. V. Jones' death, from drowning in a tank of oil, the said Humble Oil & Refining Company was a holder of an insurance policy issued by the Texas Employers' Insurance Association. In a suit brought by his father and mother for compensation, as dependents under the Workmen's Compensation Act, art. 5246—15, Vernon's Texas Civil Statutes, 1918 Supplement, providing:

"The compensation provided for in the foregoing section of this act shall be for the sole and exclusive benefit of the surviving husband, who has not for good cause and for a period of three years prior thereto abandoned his wife at the time of the injury, the wife who has not at the time of the injury without good cause and for a period of three years prior thereto abandoned her husband, and the minor children, without regard to the question of dependency, dependent parents and dependent grandparents and dependent stepmothers and dependent children, or dependent brothers and sisters of the deceased employé," etc.,

—the court instructed a verdict for the defendant, and the plaintiffs have appealed.

[1] The only question involved in this appeal is as to whether the facts make it a question of fact for the jury as to whether the plaintiffs in the case were dependent or partially dependent upon their deceased son or not. The trial court evidently concluded that the facts show undisputably that they were not so dependent or partially dependent.

F. M. Jones, the father of the deceased, testified that at the time of the trial he was living at Bristow, Okl., and had been married 22 years; that his family consisted, on October 12, 1920, of himself, his wife, his son, and an adopted daughter; that at said time he was living in Texas, 7 miles east of Breckenridge; that his son was working for the Humble Oil & Refining Company, hereinafter called oil company, and was receiving $6 a day; that he had been in such employment between 9 and 10 months continuously; that before he began working for the oil company, he worked for the Wilson Furniture Company in Tulsa, Okl., delivering and repairing furniture, and was drawing $15 a week; that, at the time of the death of his son, the witness and his wife had a piece of property in Tulsa that they had bought for a home, and this was the only property they owned; that the property cost $5,500; that he paid $1,000 cash and had, up to the time of his son's death, been making monthly payments thereon since October, 1919; that his son was paying $50 a month to his father, which was applied on the indebtedness on the home; that he was renting the place at $60 a month, and first paid $65 a month on the place, and this amount was decreased each month until it amounted to $50 monthly; and that thereafter they were obligated to pay $50 a month for the property. He further testified:

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"I can't tell the total amount in money my son had contributed in 1 or 2 years before his death. He had also helped buy some furniture, and one thing and another we had got, up until the time he went to work for the Humble Oil & Refining Company. I would not say exactly how much he had contributed during the time he worked for the furniture company, but about $20 a month and about $50 a month after he went to work for the Humble. He lived at home during the time he was working for the furniture company. My wife's health was very bad at the time and he used to help her with the dishes and things like that that had to be done around the house. We also had a cow, and he took care of the cow and things like that. When we removed from Oklahoma to Stephens county he began work for the Humble Oil & Refining Company, and after that time he made contributions to me of about $50 a month. When he would give me that money sometimes I would put it on the property, and sometimes when my check would come first I would pay on the property and keep the money he gave me. My wife's health was still very poor at the time my boy was killed, and had been poor for a year before that. The boy lived with me while he was working for the Humble; he slept there and ate his breakfast and supper there. He would assist in doing anything he could around the house; any chores, such as sweeping and things like that.

"He went to work, in the first place, when he was about 15 years old with the Gypsy Oil Company. I was working for the same company. He painted and did little odd jobs like that for them.. He lived at home all the time he was at work. At the time we had some horses and pigs and cows, and he used to take care of these and used to help do chores and such as that. He was willing and anxious to assist me and my wife. After my son's death here, on account of the shape it left things here, I had to resign my position and dispose of the place, I could not keep the payments up on it. I have bought another home since that time, buying it a year ago last November. We paid $7,200 for this last home, and there is $4,400 indebtedness against it now, or about that amount. This consists of a straight loan of $2,500 and the balance is being paid in monthly installments. You ask whether or not that home was necessary for a place for my wife and I to live? Well, I do not see why it would not be; I wanted a home to live in. We did not have any other home. The $2,500 due on that place, or the loan on it rather, will be due in 1923, and I am paying $85 a month on it, besides the big payment of $2,500. My wife and I have no means to raise that $2,500 when it falls due and it will have to be paid or extended or the place sold. That place is located at 356 Sumas street, Tulsa, Okl.''

He further testified that his wife was very nervous; in fact a nervous wreck; that she had ulcers on her stomach; that he used the $50 his son contributed for other purposes than paying on the house, to pay grocery bills and whatever he had to pay; that he was receiving $400 a month at the time of his son's death from the oil company; that he started in to work for it at $300 a month; that he was paying $5 a month rent on the house in which his family lived, and that his grocery bill amounted' to about $100; that he received $200 a month before he began to work for the oil company; that his wages or salary since 1913 ranged from $100 a month, received from the Gypsy Oil Company, to $400 a month, received from the Humble Oil.Company at the time of his son's death. He further testified:

"My boy was between 17 and 18 when I bought the house, and he had worked since he was about 15, but not steady all that time. He generally worked in the summer and would go to school in the winter. He would live at home while he was working. I did not let him spend all of it as he pleased, but did not believe in taking all he earned away from him. I would board him, of course, and give him a house to live in like any father would. My boy was a good boy and helped his mother around the house and would help me do anything he could. I supplied him with a home, board, and such clothes as I could afford in my station in life. He bought some articles of furniture for the home while he was working for the furniture's concern in Tulsa and then paid on some I bought on the installment plan. He did that voluntarily—I did not compel him to. He was giving it to me or helping me. Of course, if he did it voluntarily, it was a gift. He did not come to Texas with me in October, 1919, but came later. I first went to work for the Humble as production foreman and was assistant superintendent when I left them. I was 42 years old when I went to work for the Humble, and in good health and am in fairly good health now—I am 46 now. My boy paid $50 a month on the home I bought in Tulsa. You ask if that was by virtue of an agreement between us. Well, we talked the matter over when I bought the place and I asked him if he would help pay for it and he said he would. The $50 a month he contributed was to go to pay for this home. I have already testified that if my check come in first I would pay the $50 and use the $50 he gave me to pay for groceries and such stuff. In other words, if I paid the $50, I would use his money like I would have used my own. The payments on the house started in at $65 and then decreased until they were $50 straight through. I also testified in direct examination that outside of this payment my other expenses were mainly $100 a month for groceries and $5 a month for house rent. Part of the time my son and I were here working for the Humble my wife and daughter were in Tulsa. I came in October and they came the last of the next February, and then stayed here with me. I rented the place in Tulsa for $60 a month, and so, in addition to my salary from the Humble, I got $60 more.''

There was introduced in evidence by the defendant an affidavit made by F. M. Jones, in which he stated that the home in Tulsa was bought with the understanding between him and his son that the son would help pay for the home out of his salary or wages; that he explained to his son that the home would belong to him when the affiant and his wife died; that he was dependent upon his

son to help with the work about the house, and that his son contributed about $50 a month, as before stated; that aside from this contribution, neither the affiant nor his wife were dependent on the son in any way, although he was always willing to contribute in any way they might request. He testified to the same purport while on the stand, and upon redirect examination, and, in explanation of said testimony and the statement made in the affidavit, he said:

"When my son lived with me and did certain work about the house to help my wife and I, I relied upon and depended upon him to do and perform these duties. I was absolutely dependent upon him to do this work, and he did it up to the time of his death. When I said I was not dependent upon him for a living, I meant I was not dependent upon him to pay our grocery bills and things of that kind. I depended upon him to do the things for the comfort and convenience of the home that he had been doing ever since he was 15 years old. He was 19 years old at the time of his death. I realized it was my duty to support him up to that time and also realized that it was his duty to render me services and his legal duty to turn over to me the money he received until he was 21. I enjoyed those comforts from his labor that he bestowed upon my wife and I in the operation of the household. From the time he started to work for the furniture company up to the time of his death he did chores around the house and helped his mother with the dishes and sweeping, took care of some cows and pigs we had, and such chores as we had. If he had not done these chores I would have had to employ some one to do them, as I did not have time to do them myself. I had not contemplated, prior to the purchasing of that house, to give it to any one except my own children."

W. W. Wilson testified that he was in the furniture business at Tulsa and that Lloyd V. Jones worked for him, and that while Lloyd was working for him Lloyd and his parents purchased out of the store and paid for goods amounting to $149.25.

28 R. C. L., p. 779, § 72, under the title "Workmen's Compensation Acts," says:

"Whether a parent is dependent upon his or her child is a question of fact, which is to be determined from the circumstances of the particular case. Dependency may be predicated on the support furnished by a minor child as well as one that is an adult; and a state of dependency may exist although the applicant was living with the other spouse, and was supported in part only by the child's earnings. And it is not essential to show exactly what proportion of the parent's living expenses was contributed by the child. Inasmuch as dependency is not based upon absolute necessity, a father may be found to be dependent upon the earnings of a son who had given his wages to the father, although the latter might also be earning wages which could have supported him and his family. But a parent cannot be said to be dependent where it appears that he is enabled to save money out of his child's wages, after having paid all of the latter's expenses. As to whether dependency may be found in respect of conditions that are to commence in future—the workman having contributed nothing in the past—the authorities are not in agreement. According to the more liberal view, it is not essential to prove actual contributions by the child in order to establish the dependency of the parent. The promise of the child, or the implication from the relations of the parties, may give rise to a reasonable expectation of future support and maintenance, just as effectively as past contributions."

In Southern Surety Co. v. Hibbs, 221 S. W. 303, the San Antonio Court of Civil Appeals, speaking through Chief Justice Fly, says:

"It was not the intention of the Legislature to so limit the meaning of the word 'dependent' that a parent must be a paralytic or otherwise totally incapacitated from obtaining the bare necessities of life in order to obtain the benefit of employers' liability insurance; nor did the Legislature intend that insurance companies could evade contracts by proof that a son was not at the very time of his death giving his wages to his parents, but had temporarily obtained employment in order to buy clothes for himself which the parents were too poor to supply and at the same time relieve them of the burden of furnishing food for him. He was to return in a short time to renew his labors on the farm. * * * We prefer the more humane and reasonable decisions which give a broader and more enlightened meaning to the word as used in statutes similar to the Texas statute. The Supreme Court of Georgia, in Railway v. Glover, 92 Ga. 132, 18 S. E. 406, held:

"'Members of the same household, who live by their common labor and its proceeds, have a mutual dependence one upon another. Certainly so unless it is shown that a particular member consumes as much or more of the common stock than he contributes to it. Even that would not be a conclusive test, for the services of a child to a mother or a mother to a child may well be reckoned as contributing substantially to the support of the recipient far beyond any money value which the services may have, and the chief element of dependency may be in respect of personal service of this nature.'

"Again, in the case of Fuller v. Inman, 10 Ga. App. 680, 74 S. E. 291, the same court said:

"'It is utterly immaterial that the child does not earn sufficient money to support himself. If the mother gets the benefit of what he does earn, or of his labor, and she is dependent upon such labor or earnings for support, she has a right to recover for his negligent homicide. * * * If he performs substantial services of which she receives the benefit in and about the household, this is a contribution to her support, and she is dependent upon the child within the meaning of the law, without reference to whether he contributes one penny to her support. The statute deals with fact, not theory. It is the fact of contribution and the fact of dependency which creates the right of action.'

"The question of dependency is one of fact rather than a question of law, and each case must rest on its own facts. The test of de-

pendency is, not whether the family could support life without the services or contributions of the deceased, but whether they depended upon them as part of their income or means of living. Bradbury, Workmen's Compensation, pp. 571 to 573. All the cases seem to hold that partial dependency is all that is required, and a mere temporary intermission in the performance of services or the making of contributions will not destroy dependency."

In Lumbermen's Reciprocal Ass'n v. Warner et ux., 245 S. W. 664, by the Commission of Appeals and approved by the Supreme Court, it was urged by the defendant that the father owned real and personal property of the reasonable value of $7,000; that he was making a living independent of whatever may have been contributed by the deceased son; and that he had money in bank at and prior to the date of the son's death. The court said:

"The act nowhere defined dependents or dependency. The word is employed in the act only in enumerating the beneficiaries. It simply provides that 'the compensation * * * shall be for the sole and exclusive benefit of * * * dependent parents.' Article 5246–15. In the common acceptation of the term dependent or dependent person is included one who is dependent in whole or in part upon another for support. Had the Legislature intended to restrict compensation to cases in which the beneficiary was wholly dependent upon the injured employé for support, it could easily have used language to effect that purpose; but, not having done so, the court was without power to do so."

In Consolidated Underwriters v. Free, 253 S. W. 941, writ of error refused by the Supreme Court, this court held that the plaintiff was a "dependent sister" of the deceased at the time of his death, within the meaning of this article, though the evidence showed that she had a husband who in the main supported her, but that her deceased brother, who was unmarried, sent her contributions from time to time.

In L. R. A. 1917D, p. 159, it is said:

"Where one is within the statutory classes of dependents, it is not necessary that the dependency be total in order to entitle him to the benefit of the statute. The court will not hold that a claimant must be reduced to absolute want or be declared a pauper in order to come within the provisions of the act. A sister of a deceased workman, who was a stenographer earning about $3 a week less than the average stenographers in her city, was held to be a partial dependent of her brother, who had contributed to her support, although she could have supported herself out of her own wages. So a daughter 30 years of age, although not physically or mentally incapacitated, yet actually deriving support from her father, is entitled to the benefit of the Minnesota act. * * * In Connecticut the rule has been held to be that one cannot be a dependent who has sufficient means at hand for supplying present necessities, judging these according to the class and position in life of the alleged dependent."

[2, 3] We are of the opinion that at least it was a jury question as to whether the parents were partially dependent upon the contributions of their deceased son. The fact, as urged by appellee, that the evidence as to such dependence depended in the main upon the testimony of the father, F. M. Jones, does not justify the peremptory instruction for defendant. This, testimony developed facts that at least tended to show the father and mother were in fact partially dependent upon the labor and contributions in money of the son. Nor do we think the trial court was justified in assuming that they were not so dependent because the plaintiff father and husband testified, by his oral testimony as well as by his statement made before the trial, that neither he nor his wife was dependent upon his son for support. His explanation of such statements showed that by them he meant to say that they were not dependent upon the son to provide food and clothes for them, but they were dependent upon the labor of the son in doing the chores about the home, and in contributing to the purchase of the home. We think the purchase of a home was reasonably necessary to the support of the parents. One is not rendered less a dependent by the fact that he is able to maintain himself without the assistance of the deceased workman. Boyd's Workmen's Compensation, p. 1077, § 496. Appellee cites a great many cases to support its contention that the undisputed facts show as a matter of law that the plaintiffs were not dependents of the deceased son at the time of his death. Among these cited cases is Atwood v. Connecticut L. & P. Co., 95 Conn. 669, 112 A. 269, by the Supreme Court of Connecticut, where it was held that one steadily earning $2,000 a year, who did not require his son's earnings for his own or his family's living expenses, but who applied such earnings towards the payment of the purchase price of a house, was not a dependent within the meaning of the Connecticut Compensation Act. But even though the Connecticut courts follow the strict rule in interpreting its Compensation Act, as indicated in the quotation from L. R. A. 1917D, supra, yet the Atwood Case, cited, does say:

"The case is not that to which the commissioner likens it. If the earnings had, in fact, been used in the family support, and at the same time the plaintiff father had made a weekly or monthly saving of an amount relatively small compared to his income, or carried a life insurance for a moderate amount, or made payments of a moderate amount toward the purchase of a home, we should not be disposed to hold that the money saved, or that paid for life insurance, or toward the purchase price for a home, necessarily came in fact from the earnings of the decedent, and hence the claimant could not be a partial dependent of decedent.

"The family protection involved in such saving or such expenditure, if reasonable, accord-

ing to the station in life of the claimant, will be held to be legitimate family expenditures. They are not the savings for investment, but rather the provision of thrift for the family protection against the contingencies of death, ill health, lessening earning power, or lessening work to be had. But when the savings go beyond these reasonable bounds, and, as in this case, are at the rate of about one-half the total earnings of the claimant, they must be held to be payments made toward an investment, and not to the payment of living expenses."

We believe, under the liberal construction given by our own courts to our act, and that given to similar acts in other states, that the evidence tended to show that the father and mother were partially dependent upon the labor and earnings of their dead son, and that the trial court erred in peremptorily instructing a verdict for the defendant. Therefore, the judgment below is reversed and the cause remanded.